IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) No. 02 cr 825 |
| v. | ) |
| | ) Wayne R. Andersen |
| | ) District Judge |
| MIR ALI | ) |

## MEMORANDUM, OPINION AND ORDER

The food stamp program helps protect the neediest of families from one of the worst of their aliments–hunger. The program depends on the honesty of those it benefits, individuals that qualify for food stamps and the grocers that serve them. This opinion concerns the appropriate amount of forfeiture due from a defendant who owned a grocery store and defrauded the food stamp program.

## PROCEDURAL HISTORY

Mir Ali was originally named in a criminal complaint that also charged Mohammad Shah. Ali and Shah were both officers of Star Foods, Inc., a neighborhood grocery located at 1000 South Loomis, Chicago, IL. Ali alone was charged with, and pleaded guilty to, a superceding indictment alleging two counts of wire fraud in violation of 18 U.S. C. §§1342 & 3 stemming from a scheme to defraud the United States Department of Agriculture by trafficking in food stamp benefits. The indictment charging Ali contained a forfeiture allegation pursuant to 18 U.S. C. §981(a)(1)(c), 28 U.S.C. § 2461(c), and 21 U.S.C. § 853 which sought forfeiture of the proceeds of the wire fraud scheme, including Ali's residence in Lombard, Illinois. After Ali pleaded guilty, he waived a jury

1

determination of the forfeiture allegations and opted to have this Court determine the proper forfeiture amount. The government consented to this Court hearing the forfeiture allegations. After a hearing that included the testimony of Ali and a Special Agent with the United States Department of Agriculture, Office of the Inspector General, both the government and Ali submitted briefs regarding the proper forfeiture amount. The variance in the amount of restitution sought by the parties to this matter speaks for itself; the government seeks $2,567,587.05, while Ali contends he should forfeit only $461.

## FACTUAL BASIS SET FORTH AT THE HEARING

The following facts are taken from evidence presented at the hearing conducted by this Court to determine the appropriate forfeiture amount. In 1996, Ali signed an application for Star Foods's authorization to participate in the food stamp program. This application identified Star Foods as a "Medium or Small Grocery" and a "Convenience Store." It estimated the store's food stamp eligible sales at $150,000. Ali was also a signatory to the "Retailer Training Acknowledgment," which discussed the prohibition against exchanging food stamps for cash and indicated that rule was discussed with, and understood by, Ali. Numerous documents confirm that Ali understood the illegality of trafficking in food stamp benefits. Ali was also aquainted with the point-of-sale ("POS") device that was used to redeem food stamps from a debit-type card. (The POS device communicated with an out-of-state computer to complete the food stamp transaction.)

Star Foods came to the attention of law enforcement because its food stamp sales far exceeded any reasonable expectation based upon its application form and similarly situated stores accepting food stamps. In 1998, two law enforcement personnel went into Star Foods posing as individuals who wanted to exchange food stamp benefits for cash. One agent exchanged $230 in

benefits for $150 in cash; the other redeemed $231 in benefits for $150 in cash. Ali explained to the agents that they would have to buy something—or receive a store credit they could use later—so that a register transaction matched the time of the food stamp redemption.

To determine the amount of proceeds from the illegal scheme to defraud the food stamp program, the government went through the laborious task of reviewing all available bank records to determine the maximum possible value of food stamp eligible goods bought and sold by Star Foods, and comparing that to the amount of food stamps redeemed. $7,159,838 went into Star Foods's bank account during the scheme to defraud. 98.875% of these funds were from food stamp redemptions.

All of the checks and withdrawals from the bank account were analyzed. The government presented credible evidence that only $1,829,290.39 in expenditures from the checking account went to food and non-liquor stock—food stamp eligible items. This estimate made many assumptions that could only benefit Ali. For example, many checks went to wholesalers that sold both food stamp eligible and non-food stamp eligible products, yet the entire amounts remitted to these wholesalers were assumed to consist of only food stamp eligible purchases. Star Foods's business records were also reviewed to ensure that food stamp eligible products were not purchased with cash. The result of this extensive analysis, which was set forth in exacting detail during the hearing on this matter, showed that only $1,829,290.39 worth of food stamp eligible items were purchased by Star Foods during the scheme to defraud the government of food stamp benefits. Adjusting this amount for a 50% retail markup, which testimony confirmed was a reasonable markup assumption, reveals that Star Foods sold only $2,700,000 worth of food stamp eligible items. Food Stamp redemption records indicate that Star Foods redeemed $7,043,598.08 in food stamp benefits. This is approximately $4,290,000 greater than the amount of food stamp items sold. The government

contends that this $4,290,000 difference between the food stamp redemptions made at Star Foods and the amount of food stamp eligible items sold by Star Foods (the total food stamp eligible purchases made by the store plus a 50% markup) represents the loss amount for the scheme to defraud the food stamp program.

The government, concedes, however, that only a portion of the loss amount is subject to forfeiture. Since the law providing for forfeiture of wire fraud proceeds did not become effective until August 25, 2000, *See, Public Law No.* 106-185, only fraudulent proceeds from that date forward are considered for forfeiture proceedings. The government went through all of the records discussed above to determine the amount of fraudulent proceeds from August 25, 2000 to August 22, 2002, when the scheme ended. Those calculations derived an approximately $2,560,000 forfeiture amount.

The hearing also revealed where significant portions of the fraudulent proceeds went. $1,600,000 was removed from the Star Foods bank account in cash, $306,986.36 worth of checks were written to Ali, and $89,916.33 worth of checks were payable to Zara Sayed, Ali's wife. The down payment for Ali's residence at 1516 Acorn Ct., Lombard, Illinois, and mortgage payments made on that property, are also traceable to funds from the Star Foods bank account.

## DISCUSSION

18 U.S.C. § 981 (a)(1)(D) subjects "[a]ny property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, from a violation of . . . section 1343 (relating to wire fraud)" to civil forfeiture. 28 U.S.C §2461 instructs us that "[i]f a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized" and the defendant is convicted we "shall order the forfeiture of the

property as part of the sentence in the criminal case." Thus, the forfeiture determination set forth in this order will become part of the final judgment and commitment we enter in this case.

To meet its burden in a forfeiture proceeding, the government must "establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983 (c)(1). An essential element of the government's burden is to show that there is a nexus between the property and the criminal conduct leading to the defendant's conviction. 18 U.S.C. § 981. However, there is no requirement that seized assets be limited to property acquired individually, as opposed to property derived indirectly from others in the conspiracy. *United States v. McHan*, 101 F.3d 1027, 1043 (4th Cir. 1996).

The government met its burden of showing that the scheme for which Ali was convicted derived approximately $2,560,000. The government also demonstrated that Ali took sizeable amounts of that gain from the Star Foods bank account in cash, checks, payments on his residence, and payments to his wife. However, the government did not identify $2,560,000 worth of assets held by Ali, much less establish that those assets were traceable to the scheme to defraud the food stamp program. As such, the $212,114.15 seized from bank accounts that were traceable to the fraud and the residence located at 1516 Acorn Ct., Lombard, Illinois are subject to forfeiture.

This Court further finds that the loss amounts set forth by the government are attributable to Ali. Ali's contention that he is not responsible for the entire amount lost in the scheme merely because his co-conspirators were either never indicted, or died after being indicted, is without merit. The government may seek the forfeiture of additional property if that property is traced to the conspiracy of which Ali was a member or the government demonstrates that 28 U.S.C. § 853(p),

which allows the forfeiture of substitute property, applies. It is so ordered.

                                                                 Wayne R. Andersen
                                                           United States District Court

Dated: July 17, 2006